## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SLOAN, | : | CIVIL ACTION |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| CORECARE BEHAVIORAL HEALTH | : | |
| MANAGEMENT, INC. et al | : | |
| | : | |
| *Defendant.* | : | NO.  22-cv-04703 |

## MEMORANDUM

**KENNEY, J.**                                                                      **April 5, 2023**

### I.   INTRODUCTION

The issue before the Court is whether a pre-litigation settlement agreement between Katerry Sloan ("Plaintiff") and CoreCare Behavioral Health Management, Inc. and CoreCare Systems, Inc., d/b/a Kirkbride Center (collectively, "Defendants") is enforceable. This issue has been fully briefed and an evidentiary hearing was held on February 7, 2023. For the reasons set forth below, the Court deems the settlement agreement enforceable and, accordingly, will dismiss this action in its entirety.

### II.   BACKGROUND & PROCEDURAL HISTORY

Plaintiff was employed by Defendants until February 7, 2022. ECF No. 1 at ¶ 88. In April 2022, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") regarding allegations of employment discrimination in violation of Title VII. *Id.* at ¶ 5. The EEOC issued a Determination and Notice of Rights letter to Plaintiff on August 25, 2022. *Id.* at ¶ 6. Prior

to Plaintiff filing suit against Defendants, and at Defendants' request, the parties agreed to participate in private mediation. *Id.* at ¶ 27.

Mediation took place via Zoom on November 2, 2022 and was attended by Ms. Cimini, Esq. (Mediator), Plaintiff and Plaintiff's counsel, and Mr. Fleming (Defendants' corporate representative) and Defendants' counsel. *Id.* at ¶ 29. However, Defendants' corporate representative left the Zoom call while mediation was ongoing. ECF No. 6 at ¶ 46. Subsequently, Defendants' counsel conveyed a "final offer" of $100,000, which Plaintiff accepted. ECF No. 1 at ¶¶ 31–46. Defendants' counsel worked to finalize a memorandum of understanding ("MOU") and, once the MOU was finalized, represented that "on behalf of myself and Defendants we accept these terms." *Id.*; ECF No. 1-7 at 2.

Following mediation, however, Defendants refused to pay the $100,000 as outlined in the MOU. ECF No. 1 at ¶ 48. Accordingly, Plaintiff initiated this action on November 23, 2022. Plaintiff's Complaint alleges breach of contract (Count I), promissory estoppel (Count II), and fraudulent inducement (Count III) for Defendants' failure to abide by the terms of the MOU. ECF No. 1 at ¶¶ 25–62. Plaintiff also brings the employment-related claims initially contemplated (Counts IV–X). *Id.* at ¶¶ 63–118. Defendants maintain that Defendants' counsel acted beyond the scope of her authority and that the MOU is therefore unenforceable. *See generally*, ECF No. 6.

Upon review of the allegations set forth in the Complaint, it was apparent that moving forward on the action required an evidentiary hearing, at the outset, as to whether the matter had been settled. If the dispute had indeed been settled, it would have negated the need to move forward with the litigation. On January 24, 2023, the Court ordered both parties to brief the issue of whether this action should proceed given that the settlement had been accepted in writing. ECF No. 9. The Court also scheduled a hearing on the issue for February 7, 2023 and ordered that Ms. Moreland,

Mr. Fleming, Ms. Di Ottavio, Mr. O'Riorden, Mr. Hennelly, and Ms. Cimini appear at the hearing. *Id.* On January 30, 2023, to avoid conflict of interest issues, counsel from Ms. Moreland's firm withdrew their representation of Defendants. ECF No. 10. Accordingly, Mr. O'Riordan, who is not associated with Ms. Moreland's firm, entered his appearance. *Id.* Both parties filed their respective briefs regarding the enforceability of the settlement agreement on February 1, 2023 and their respective responses on February 3, 2023. ECF Nos. 11–14.

On February 7, 2023, the Court held a hearing on the enforceability of the settlement agreement. At the hearing, Plaintiff presented Ms. Cimini, Mr. Hennelly, and Ms. Moreland for direct and cross examination and entered ten supporting exhibits into the record, which were subsequently filed on the docket. ECF Nos. 17–18. Defendants presented Mr. Fleming for direct and cross examination and did not enter any additional exhibits. ECF No. 18. Following the hearing, the Court ordered each party to file proposed findings of fact and conclusions of law. ECF No. 16. Plaintiff filed proposed findings of fact and conclusions of law and an accompanying brief on February 21, 2023. ECF Nos. 20–21. Defendants also filed proposed findings of fact and conclusions of law on February 21, 2023. ECF No. 22. On March 3, 2023, both parties filed briefs in opposition to the opposing proposed findings of fact and conclusions of law. ECF Nos. 23–24.

### III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

Upon consideration of the testimony presented at the February 7, 2023 hearing and the record evidence, the Court makes the following findings of fact[1] and conclusions of law.

### A.  Findings of Fact

1.  Plaintiff alleged employment discrimination against Defendants and, in July 2022, conveyed to Defendants that she would not settle for below six figures.

2.  On July 27, 2022, Plaintiff made a demand of $210,000.

3.  In August 2022, Defendants proposed participating in pre-litigation mediation.

4.  The parties selected Ms. Cimini, Esq. as their mediator.

5.  Mediation was held on November 2, 2022, via Zoom conference call.

6.  At all relevant times, Plaintiff was represented by Mr. Manes, Esq. ("Plaintiff's counsel").

7.  At all relevant times, Defendants were represented by Ms. Moreland, Esq. ("Defendants' counsel").

8.  Defendants' counsel is a Partner at Marks, O'Neill, O'Brien, Doherty & Kelly.

9.  Defendants' counsel has over twenty years of experience as a practicing attorney.

10. Defendants' counsel has successfully settled hundreds of cases on behalf of clients.

11. Ms. Cimini is an experienced mediator who routinely facilitates settlement negotiations and agreements.

12. Mr. Fleming served as Defendants' representative at mediation and was appointed with full authority to settle Plaintiff's claims.

---

[1] The Court makes such findings by a preponderance of the evidence.

13. Defendants were insured against Plaintiff's claim by RSUI Group, Inc. ("RSUI") under a policy with a $1,000,000 claim limit, a $75,000 Self-Insured Retention ("SIR"), and a consent to settle provision.

14. RSUI assigned Ms. Vogt as the Adjuster, who was overseen by Mr. Hennelly.

15. On November 1, 2022, one day prior to mediation, Defendants' counsel met with Ms. Vogt and Mr. Fleming to discuss mediation strategy and settlement authority.

16. In the November 1, 2022 strategy meeting, Mr. Fleming gave Defendants' counsel express authority on behalf of Defendants to settle Plaintiff's claims for an amount exceeding $75,000 (the SIR amount for which Defendants were responsible). At the February 7, 2023 hearing, the parties presented conflicting evidence as to whether this express authority was granted, however, the Court deems the testimony of Ms. Moreland credible and does not find Mr. Fleming credible on this issue.

17. In the November 1, 2022 strategy meeting, Ms. Vogt gave Defendants' counsel authority to settle for up to $25,000 in excess of the $75,000 SIR.

18. Accordingly, in the November 1, 2022 strategy meeting, Defendants' counsel, Mr. Fleming, and Ms. Vogt agreed that the maximum settlement authority for the following day was $100,000 and Defendants' counsel was vested with affirmative and express authority to settle for an amount up to that maximum. At the February 7, 2023 hearing, the parties presented conflicting evidence as to whether express authority was granted for the total settlement amount of $100,000, however, the Court deems the testimony of Ms. Moreland credible and does not find Mr. Fleming credible on this issue.

19. Ms. Vogt memorialized this authority via RSUI's internal files.

20. For the majority of mediation, the parties and their counsel were in separate "breakout" Zoom rooms, which allowed each party to communicate with counsel at length.

21. While in the breakout rooms together, Mr. Fleming did not revoke the express authority granted to Defendants' counsel nor did he indicate that the scope of her authority was in any way modified.

22. Prior to and during mediation, Defendants' counsel reviewed the standard terms of MOUs with Mr. Fleming, to which Mr. Fleming did not object. At the February 7, 2023 hearing, the parties presented conflicting evidence as to whether Mr. Fleming was aware of and agreed to the standard MOU terms, however, the Court deems the testimony of Ms. Moreland credible and does not find Mr. Fleming credible on this issue.

23. At mediation, the parties exchanged demands and offers as follows.

    a. Plaintiff demanded $210,000.

    b. Defendants offered $50,000.

    c. Plaintiff demanded $175,000.

    d. Defendants offered $70,000.

    e. Plaintiff demanded $162,500.

    f. Defendants offered $75,000.

    g. Plaintiff demanded $157,500.

    h. Defendants offered a bracket of $80,000 to $100,000.

    i. Plaintiff demanded a bracket of $110,000 to $140,000.

     j.   Defendants offered a final offer of $100,000.

     k.   Plaintiff made a final offer demand of $120,000.

     l.   Defendants re-offered $100,000 as a final offer that would erode.

     m.  Plaintiff accepted Defendants' offer of $100,000.

24. At some point between 1:00 p.m. and 2:00 p.m., while mediation was still underway, Mr. Fleming left the mediation.

25. When Mr. Fleming left the mediation, Defendants had offered to settle the case for nearly the full sum of Defendants' SIR (either $70,000 or $75,000).

26. Mr. Fleming did not indicate that the last offer for which he was present, of either $70,000 or $75,000, was Defendants' best and final offer or approaching the limit of Defendants' counsel's authority.

27. Mr. Fleming's departure did not signify the end of mediation efforts, and Mr. Fleming did not tell Defendants' counsel to desist in negotiations when he left.

28. Mr. Fleming did not indicate that mediation would be infeasible without his presence.

29. Mr. Fleming did not indicate that he was to be contacted as to every offer made and, indeed, was largely unavailable and unresponsive after leaving the mediation.[2] At the February 7, 2023 hearing, the parties presented conflicting evidence as to whether Mr. Fleming asked to be made aware of every offer made subsequent to

---

[2] Although Mr. Fleming claims that he was to be informed of every offer made, the evidence indicates that he was not monitoring his email or reachable by phone while negotiations were ongoing. Specifically, Defendants' counsel was unable to reach Mr. Fleming by phone call. Additionally, he did not respond to Defendants' counsel's emails for at least 31 minutes and at most 1 hour and 25 minutes following her first indication that an offer of $100,000 was forthcoming (Defendants' counsel's email is not time stamped but was sent at some point between 1:23 p.m. and 2:17 p.m.) and her final acceptance (at 2:48 p.m.). Mr. Fleming's unresponsiveness while mediation was ongoing undermines his subsequent testimony.

his departure, however, the Court deems the testimony of Ms. Moreland credible and does not find Mr. Fleming credible on this issue.

30. Mr. Fleming generally instructed Defendants' counsel to "keep him posted." At the February 7, 2023 hearing, the parties presented conflicting evidence as to whether Mr. Fleming asked to be made aware of every offer made subsequent to his departure, however, the Court deems the testimony of Ms. Moreland credible and does not find Mr. Fleming credible on this issue.

31. At no point during mediation or prior to his departure did Mr. Fleming revoke the express authority granted to Defendants' counsel from the day prior to settle the case for $100,000.

32. Accordingly, Defendants' counsel continued to negotiate on Defendants' behalf.

33. At 1:23 p.m., Mr. Fleming sent counsel an email in which he clarified that the company was not for sale as Plaintiff believed; Mr. Fleming provided this information because he suspected that Plaintiff was using the upcoming sale as leverage in negotiations, which were ongoing.

34. At some point between 1:23 p.m. and 2:17 p.m., Defendants' counsel emailed Mr. Fleming to inform him that negotiations would soon come to a "take it or leave it at 100k" situation.

35. Mr. Fleming did not respond to this email in a manner indicating Defendants' counsel was not authorized to offer $100,000.

36. Defendants' counsel conveyed a final offer of $100,000, which Plaintiff accepted.

37. The amount of $100,000 represents approximately half of Plaintiff's original demand and two times Defendants' initial offer and is within the "six figure range" that Plaintiff provided as her minimum settlement amount.

38. At 2:17 p.m., Defendants' counsel emailed Mr. Fleming to inform him that the case had settled for $100,000.

39. In this 2:17 p.m. email, Defendants' counsel recognized that Defendants had hoped to settle for a lesser amount in an ideal situation by providing "I know that this is more than you want to pay for all the reasons we discussed."

40. With respect to one ancillary provision of the MOU involving paying the settlement as W-2 wages or 1099 income, but not the total sum of $100,000, Defendants' counsel asked for confirmation that this approach was "agreeable."

41. The payment allocation between W-2 or 1099 income could have been subject to additional negotiations between the parties but, generally, such allocation is *pro forma* in employment settlements.

42. Ms. Cimini sent a first draft of the MOU to Defendants' counsel at 2:17 p.m.

43. This draft contained terms, other than the settlement amount, which were similar to those previously discussed between Defendants' counsel and Mr. Fleming.

44. Defendants' counsel revised the draft MOU to include the settlement amount agreed upon of $100,000 and sent the revised draft to Ms. Cimini.

45. Ms. Cimini emailed both parties' counsel at 2:40 p.m. congratulating them on the settlement and attaching the MOU.

46. Plaintiff's counsel accepted the MOU on behalf of himself and Plaintiff at 2:46 p.m.

47. Defendants' counsel accepted the MOU on behalf of herself and Defendants at 2:48 p.m.

48. Ms. Cimini, an experienced mediator who had been interacting with Mr. Fleming throughout mediation, had no reason to believe that Defendants had not authorized the $100,000 offer.

49. Ms. Cimini would not have conveyed the offer to Plaintiff if she suspected that it was not authorized by Defendants.

50. At some point after mediation had finished, Mr. Fleming discussed the settlement with other Directors of Defendants.

51. Mr. Fleming then informed Defendants' counsel for the first time that Defendants would not settle for $100,000.

52. On November 10, 2022, Defendants' counsel notified Plaintiff's counsel that Defendants did not intend to abide by the terms of the MOU.

**B. Conclusions of Law**

1. Under Pennsylvania law, which is applicable here, "an attorney has no authority to settle his client's case solely by virtue of his general power to handle the case." *Garabedian v. Allstates Eng'g Co.*, 811 F.2d 802, 803 (3d Cir. 1987).

2. Rather, it is "well-settled that only express authority [exercised by an attorney] can bind a client to a settlement agreement." *Teva Pharm. Ind., Ltd. v. United Healthcare Servs., Inc.*, 341 F. Supp. 3d 475, 504 (E.D. Pa. 2018) (citing *Ruetzel v. Douglas*, 582 Pa. 149 (2005)).

3. Indeed, "a client's attorney may not settle a case without the client's grant of express authority and such express authority can only exist where the principal

specifically grants the agent the authority to perform a certain task on the principal's behalf." *Id.* (internal quotes omitted).

4. While express authority is "directly granted by the principal to bind the principal as to certain matters," the related concept of implied authority is "that which binds the principal to those acts of the agent that are necessary, proper and usual in the exercise of the agent's express authority." *GF Industries of Missouri, LLC v. Lehigh Valley Genomics, LLC*, No. 22-cv-0227, 2022 WL 16636936, at *4 (E.D Pa. Nov. 2, 2022) (internal quotes omitted).

5. On behalf of Defendants, Mr. Fleming granted Defendants' counsel express authority to settle the case for a maximum total of up to $100,000 on November 1, 2022.

6. Implied in the express authority granted to Defendants' counsel was the authority to make and accept settlement offers of up to $100,000 on behalf of Defendants.

7. Implied in the express authority granted to Defendants' counsel was the authority to agree to *pro forma* settlement terms.

8. Mr. Fleming never revoked or modified the authority granted to Defendants' counsel.

9. The authority granted to Defendants' counsel was still in effect when Mr. Fleming left the mediation on November 2, 2022.

10. Defendants' counsel offered a settlement of $100,000 based on express authority granted by Mr. Fleming.

11. Defendants' counsel accepted the terms of the MOU on behalf of Defendants based on the implied authority conveyed by way of the express authority.

11

12. To be enforceable, an agreement "must be certain about the nature and extent of its obligations" and an agreement "fails for indefiniteness when it is impossible to understand what the parties agreed to because the essential terms are ambiguous or poorly defined." *Shell's Disposal & Recycling, Inc. v. City of Lancaster*, 504 F. App'x 194, 202 (3d Cir. 2012).

13. The "essential terms" of the MOU were the amount to be paid to Plaintiff and that she was giving up the right to sue Defendants as consideration for the settlement award.

14. Defendants' claim that the MOU is ambiguous because various terms are not defined is without merit because it is only "impossible to understand what the parties agreed to" when the terms of the MOU are entirely divorced from the context of this case and standard settlement proceedings.

15. The settlement agreed to by the parties and described in the MOU is sufficiently definite and legally enforceable because the essential terms are unambiguous.

16. The allocation of $5,000 of the $100,000 for payment as W-2 wages and the remainder allocated as 1099 income is reasonable and lawful.[3]

17. Defendants are bound by the terms of the MOU and the MOU is enforceable against Defendants.

---

[3] The IRC provides that all amounts from any source are included in gross income unless a specific exception exists. 26 U.S.C. § 61. Gross income does not include "the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness." 26 U.S.C. § 104(a)(2). Here, Plaintiff did not allege physical injury or sickness. In the context of employment settlements, the amount constituting wages is reportable as W-2 income and the amount constituting non-physical injuries (such as emotional or punitive damages) and attorneys' fees are reportable as 1099-MISC income. *See* 26 U.S.C. §§ 6041, 6045, 6051; 26 C.F.R. §§ 1.6041-1, 1.6041-2.

## IV.      CONCLUSION

For the reasons stated above this Court finds that the settlement agreement entered into between the parties on November 2, 2022 is enforceable. Accordingly, Defendants must pay Plaintiff the sum of $100,000 as provided in the MOU. Further, this case is dismissed because Plaintiff's claims are either barred by the settlement agreement or are otherwise moot.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**
